Lucia Schueg NIELSEN, Appellant,

v.

The SECRETARY OF the TREASURY et al., Appellees.

Edwin H. NIELSEN, Appellant,

v.

The SECRETARY OF the TREASURY et al., Appellees.

Enriqueta Schueg BOSCH, Appellant,

v.

The SECRETARY OF the TREASURY et al., Appellees.

Nos. 21884–21886.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1969.

Decided Feb. 5, 1970.

Mr. Joseph E. Casey, Washington, D. C., with whom Mr. Thomas B. Scott, Washington, D. C., was on the brief, for appellants.

Mr. Bruno A. Ristau, Atty., Department of Justice, with whom Asst. Atty. Gen., Edwin L. Weisl, Jr., at the time the brief was filed, Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, and Morton Hollander, Atty., Department of Justice, were on the brief, for appellees.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellants are Cuban refugees who own 750 of the 1000 outstanding shares of Acueducto Yateritas, S.A., a Cuban corporation which until February 6, 1964 was engaged in the business of supplying water to the United States Naval Base at Guantanamo Bay. They brought this action to test the statutory and constitutional validity of the Cuban Assets Control Regulations insofar as they have been applied by the Secretary of the Treasury to prohibit appellants from obtaining their proportionate interest in the assets of Yateritas located in the United States. The court below dismissed appellants' complaint because it failed to state a claim for which relief could be granted. We agree that appellants have not alleged agency action in violation of either the Trading with the Enemy Act, 50 App. U.S.C. § 1 et seq., or the Constitution and accordingly we affirm.

The complaint and accompanying papers of record provide the material facts and may be summarized as follows: In 1937 Yateritas, entered into a long-term contract with the United States Navy to supply fresh water to the Guantanamo Naval Base in Cuba. The corporation continued to operate the water supply service for the Navy after the Cuban Revolution in 1957–1958. In August and September of 1960 appellants, accounting for three-fourths of the Yateritas stock, left Cuba with their families "to avoid the consequences of residing in

Cuba under the Castro regime," and they now live in other places in the Western Hemisphere.[1] After appellants had fled Cuba the corporation continued to supply the naval base with water until its property was seized and shut down by the Castro government on February 6, 1964. At that time the corporation had not been paid by the United States Navy for water supplied between November 22, 1963 and February 6, 1964. On October 22, 1965 the United States Navy entered into an agreement of settlement with Yateritas as Contractor, described as a corporation organized and existing under the laws of Cuba, the corporation signing by its president and its treasurer.[2] The Navy agreed to pay Yateritas $34,450.20 for the water supplied and to return to the corporation a contract performance bond of $20,000. These moneys were deposited in the account of the corporation at the First National City Bank of New York. Pursuant to the Cuban Assets Control Regulations this account is blocked, and the funds deposited therein may not be withdrawn or disposed of without a license from the Secretary of the Treasury. The application by Yateritas for such a license was denied by the Office of Foreign Assets Control, in the Treasury Department, in June 1966 on the ground that "[T]ransactions of this type are not consistent with the present policy of this government with respect to Cuba." Thereafter, in August 1967, appellants in their capacity as shareholders of Yateritas filed separate license applications in their own names with the Federal Reserve Bank in New York requesting (1) that each of them be declared an unblocked national within the meaning of 31 C.F.R. § 515.307,

Cuban Assets Control Regulations; and (2) that the Secretary unblock and permit the transfer and payment to each of them of their "respective 25 percent interest in the assets of the corporation consisting of the bank account in the First National City Bank * * *." With respect to request (1) the bank directed their attention to 31 C.F.R. § 515.-506 which by general license and without need for application unblocks Cuban refugees in friendly foreign countries who left Cuba before July 8, 1963 unless the Office of Foreign Assets Control has determined that the refugee has acted on behalf of the Castro regime. The bank denied request (2) for the same reason that the Office of Foreign Assets Control had denied the license application of Yateritas. Appellants then brought this action seeking a judgment directing the defendants to license each of the appellants to withdraw one-fourth of the balance in the bank account of Yateritas in the First National City Bank of New York. Additionally they sought a declaration that the action of the defendants had deprived them of property without due process of law and that each was an "unblocked national" and, as such, an "innocent stockholder" of Yateritas.

I *The blocking of the United States assets of the Cuban corporation is in accordance with regulations, which are authorized by statute applicable in times of war or emergency.*

■ The Treasury officials have "blocked" the United States assets of a Cuban corporation. Do they have authority to take this action? Reserving certain questions of constitutionality we conclude that the blocking action is au-

---

1. For simplicity the stockholder refugees are referred to as the appellants, though in the case of stockholder Victor H. Schueg, who died in 1966, a resident of Puerto Rico, the appellant is Edwin H. Nielsen, executor of his estate. The other two appellants are stockholders: Lucia Schueg Nielsen, and Enriqueta Schueg Bosch, who were, at the time of institution of these actions in 1967, residents of of Costa Rica and Nassau, respectively.

2. In addition, the Agreement of Settlement provides that the Contractor shall indemnify the United States for any claim by any person or foreign government growing out of the termination of the contract or payment or delivery thereunder to the Contractor. The President and Treasurer of the Contractor further agreed to underwrite this indemnity in their individual capacities and for their heirs, successors and assigns.

thorized by applicable regulations, which are in turn authorized by statute.

1. Section 5(b) of the Trading with the Enemy Act, as amended,[3] provides that during time of emergency the President may prohibit any transfer in "any property in which any foreign country or a national thereof has an interest" if the property is "subject to the jurisdiction of the United States."

3. See, 50 App.U.S.C.A. § 5:

(b) (1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States;

4. 50 App.U.S.C.A. p. 6 (1951).

5. (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsover, direct or indirect:

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and

(2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

(c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth

2. Since 1950 the United States has officially been in a state of emergency,[4] and so the authority described in § 5 of the Trading with the Enemy Act was available to, and validly invoked by, the Secretary of the Treasury when on July 8, 1963, he issued the Cuban Assets Control Regulations, 31 C.F.R., Part 515 (1969). The pertinent provisions, of the regulations, set forth in the footnote,[5]

in paragraphs (a) or (b) of this section is hereby prohibited.

(d) For the purposes of this part, the term "foreign country designated under this part" and the term "designated foreign country" mean Cuba and the term "effective date" and the term "effective date of this section" mean with respect to Cuba, or any national thereof, 12:01 a. m. e. s. t., July 8, 1963.
31 C.F.R. § 515.201(b)-(d) (1969).

(a) The term "national" shall include:

(1) A subject or citizen of, or any person who has been within, a foreign country, whether domiciled or resident therein or otherwise, at any time on or since the "effective date."

(2) Any partnership, association, corporation, or other organization, organized under the laws of, or which on or since the "effective date" had or has had its principle place of business in a foreign country, or which on or since such effective date was or has been controlled by, or a substantial part of the stock, shares, bonds, debentures, notes, drafts, or other securities or obligations of which, was or has been owned or controlled by, directly or indirectly, a foreign country and/or one or more nationals thereof as defined in this section.

(3) Any person to the extent that such person is or has been, since the "effective date" acting or purporting to act directly or indirectly for the benefit or on behalf of any national of a foreign country.

(4) Any other person who there is reasonable cause to believe is a "national" as defined in this section.

(b) The Secretary of the Treasury retains full power to determine that any person is or shall be deemed to be a "national" within the meaning of this section, and to specify the foreign country of which such person is or shall be deemed to be a national.
31 C.F.R. § 515.302(a) (1969).

(a) Any payment or transfer of credit to a blocked account in a domestic bank in the name of any designated national

prohibit any transfer—unless specifically authorized by a license—which involves property in which a "designated" foreign country "or any national thereof has * * * any interest of any nature whatever, direct or indirect." Cuba has been "designated." The term national is defined specifically to include any corporation organized under the laws of the foreign country, as well as a corporation which has had its principal place of business in the foreign country on or since the appropriate "effective date" (July 8, 1963 in the case of Cuba).

3. There is an unblocking provision in the regulations.[6] It provides for unblocking "on the ground that no person having an interest in the property is a designated national."

The Secretary construes this unblocking provision to be inapplicable where the property was owned by a Cuban corporation since the 1963 effective date, in view of the interest of that national of a designated foreign country. We need not now concern ourselves with the problem of a case where the corporation's interest was purely nominal, akin, say, to the legal title of the trustee of a dry trust, and where the only meaningful ownership interest under applicable foreign law was in the shareholders.[7] In

the case before us Yateritas was in active business, as a corporation, subsequent to the effective date. The larger part of the funds involved in this action consists of moneys earned for water delivered between November 1963 and February 1964, earned by the corporation after the appellants had fled Cuba through the efforts of the corporate employees who remained behind. The balance consists of the proceeds of securities of the corporation, which the Government was holding to secure contract performance in Cuba subsequent to the effective date of July 8, 1963.

■ 4. The work done by the Cuban corporation between November 1963 and February 1964 was work which the United States desired to be done. The United States did not desire a complete cessation of commercial intercourse with Cuba, since its forces on Guantanamo needed supplies from Cuban sources. We need not consider the transfer of payments from the Navy to the Cuban corporation while the work was going on; these were presumably authorized.[8] All this does not make the corporation furnishing the desired supplies any less Cuban, or its assets within the United States any less blocked.

---

is hereby authorized providing such payment or transfer shall not be made from any blocked account if such payment or transfer represents, directly or indirectly, a transfer of the interest of a designated national to any other country or person. 31 C.F.R. § 515.508(a).

6. Any interested person desiring the unblocking of accounts or other property on the ground that no person having an interest in the property is a designated national may file such an application. Such application shall be filed in the manner provided in § 515.801(b) and shall contain full information in support of the administrative action requested.

The applicant is entitled to be heard on the application. If the applicant desires a hearing arrangements should be made with the Office of Foreign Assets Control.

31 C.F.R. § 515.802 (1969).

7. *Compare* Pernikoff v. Kennedy, 219 F. Supp. 854 (D.D.C.1963).

8. Nor need we concern ourselves with whether Guantanamo Naval Base is part of the "United States" within the blocking regulations. Assuming it is, the national of a designated country which was actually engaged in a commercial business "within the United States" on the effective date "is authorized to engage in all transactions ordinarily incidental to the normal conduct of its business activities within the United States." 31 C.F.R. § 515.511(a). This comprehends the receipt of payments but when these are paid into a domestic bank they must be paid into a blocked account. 31 C.F.R. § 515.508. Thereafter they may be withdrawn only pursuant to a license. We cannot say that the Secretary would lack authority to provide licenses for purposes of on-going business even though licenses were not issued for distributions of corporate assets.

II *There are no constitutional requirements entitling the non-Cuban shareholders to withdraw a proportionate share of the blocked assets of the Cuban corporation.*

The plaintiff-applicants present in somewhat general terms the contention that they have been deprived of their property without due process of law. Their somewhat diffused complaints relate to the deprivation involved in extended prolongation of a freezing action. We have taken a broad view of the constitutional aspects of the case to consider whether on these or other grounds there has been unfairness to plaintiffs which rises to constitutional dimensions, or presents such serious constitutional questions as to dictate an application of the regulations contrary to that of the Secretary.

■ 1. We see no general constitutional inhibition that overrides a statute authorizing the institution, during time of national emergency, of a program that freezes the status within the United States of assets of a national of a foreign country "designated" by the President.

■ No standards are provided as to which country shall be "designated," but if there is any vitality to the doctrine that a statute may not confer undue latitude in the President it has minimal force in the area of foreign relations. United States v. Curtiss-Wright Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

■ 2. There is no sound judicial basis for undercutting either the 1950 Presidential determination that the country is in a state of national emergency due to "the increasing menace of the forces of communist aggression," [9] or the determination of succeeding Presidents, expressly or impliedly, that a state of national emergency continues to exist, or the 1963 determination that it is appropriate in this state of emergency that Cuba be "designated" so as to make applicable the scheme of blocking transfers of assets. The executive officials acted within the zone of their discretion when they concluded in 1963 that the attitude and activities of Cuba were so inimical to the interests of the United States that the United States was justified in suspending access to assets within the United States on the part of Cuba or its nationals, and prohibiting any transfer of assets in which Cuba or any of its nationals had an interest, except with special permission or license.[10] Sardino v. Federal Reserve Bank of New York, 361 F.2d 106 (2d Cir.), cert. denied 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).

3. The question arises whether the policy of the United States to deny United States assets to Cuba and its nationals can be meaningfully interposed as an objection to the claims of individuals like plaintiffs who are not "blocked" nationals.

The argument made by plaintiffs is not without force. The applicants here involved left Cuba before the "effective date" of the blocking regulation. They are entitled to the receipt from any United States bank of assets in which only they have an interest. There is no claim of a Cuban taint attaching to them as individuals which would lead the Secretary to deny return of their assets on the ground that they might be a conduit to Cuba.

Intensification of the economic isolation of Cuba, begun with the 1962 Cuban Import Regulations,[11] was certainly the

---

9. Presidential Proclamation No. 2914, December 16, 1950, 64 Stat. A454. This followed the entry of Communist Chinese forces into Korea.

10. This action followed the adoption of a resolution on July 3, 1963, by the Council of the Organization of American States urging member governments to implement a series of recommendations to counter Castro-Communist subversion in the hemisphere.

11. Since February 7, 1962, the Import Regulations prohibited import into the United States of all goods of Cuban origin, e. g., sugar, tobacco, molasses, and since March 23, 1962, they prohibited im-

dominant and perhaps the sole reason for issuance of the 1963 blocking regulations in the first instance.

The freeze on transfer of Cuban assets was not necessarily, however, a freeze on American policy concerning the future of those assets. As a reasonably authoritative government source has pointed out, the freeze of the assets of a foreign country may not only promote economic isolation in the present, but also constitute meaningful planning for the future, by preserving the assets involved for possible use in some satisfaction of American claims against the country involved—perhaps by unilateral action of the United States, perhaps as part of a settlement with that country, a settlement that might include an agreement of that country to provide compensation to the owners.[12]

In short, the "blocking" may be followed by a vesting of assets. The major historical precedents for such action relate to foreign countries having the status of "enemy" in time of war. Accordingly those war vestings have an element of the "withholding of spoils of war." [13] Yet these war vestings have also been followed by peace treaties whereby the use of the assets by the United States to pay claims of American citizens against the foreign country involved was confirmed by the agreement of that country. This ensued in the case of the peace treaties with Germany, following World War I, and with Bulgaria, Hungary and Rumania at the end of World War II.[14]

Indeed the fund available for American claimants has been enhanced in the case of Bulgaria and Rumania by contributions of those countries over and above the use of proceeds of vested assets.[15]

We are in no position to say that the precedents sanctioned by international agreement in the case of war may not validly be invoked as a national response to the kind of hostile actions that have erupted in numerous and varied permutations during the course of the cold war.

In the case of Czechoslovakia the United States followed a pattern of vesting Czechoslovakian assets and creating a fund for use in compensating United States citizens for Czechoslovakian expropriations since 1945. In 1947, prior to the Communist coup, Czech interests ordered steel mill equipment in the United States. It was blocked by the Secretary of the Treasury in 1952, and in 1954 it was sold to the highest bidder for $9 million. The use of these assets for American claimants rests thus far on unilateral action of the United States. But there have been negotiations between the United States and Czech delegations concerning settlement of American claims. They were begun in 1949, and suspended. They were resumed in 1955.[16] As of this writing, subsequent to the entry of Soviet troops into Czechoslovakia in 1968, they are again in suspense. But the prospect or at least possibility of international settlement and agreement cannot be dismissed by the

ports of goods made in third countries with Cuban components, e. g., cigars manufactured in Holland in whole or in part with Cuban tobacco. Sommerfield, Treasury Regulation Affecting Trade with the Sino-Soviet Bloc and Cuba, 19 Bus. Lawyer 861 (1964).

12. Sommerfield, supra note 9, at p. 862, for discussion of Foreign Assets Control Regulations issued in 1950 as to Communist Chinese Assets, and at p. 867, pointing out that in major respects the 1963 Cuba assets control regulations are parallel to the Foreign Assets Control Regulations.

13. Guessefeldt v. McGrath, 342 U.S. 308, 313–14, 72 S.Ct. 338, 96 L.Ed. 342 (1952).

14. Sardino v. Federal Res. Bank, supra, 361 F.2d at 113.

15. Foreign Claims Settlement Commission of the United States Annual Report for 1968, at 17, 18.

16. Staff Memorandum on Claims Programs Administered by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, as amended, Committee Print, Senate Foreign Relations Committee, 88th Cong. 1st Sess. at 9.

courts as a nullity, or declared an inadmissible or unavailable aspect of America's foreign policy program. Reference may be made, for example, to the agreement reached between the United States and Poland on July 16, 1960.[17]

In the case of Cuba, where control measures account for $148.8 million of assets,[18] Congress and the Executive have not yet decided on the ultimate disposition of the frozen Cuban assets. Five years ago, in P.L. 88–666 (October 16, 1964, 78 Stat. 1110, 22 U.S.C. § 1643), Congress ordered the Foreign Claims Settlement Commission to determine the validity and amount of claims of nationals of the United States against the Government of Cuba for losses resulting from the nationalization or other taking of property by the Cuban Government after January 1, 1959, and for disability or death caused by actions of that Government.[19]

■ 4. In effect applicants argue that they are entitled to require the gov-

ernment to disregard the entity of the Cuban corporation, or its interest in the property held in the name of the corporation, and are entitled to have the rules regulating transfer of that property determined by reference to the position of the shareholders. Here the three applicants for unblocking are refugees who left Castro's Cuba in 1960, who account for the bulk (75%) of the underlying stockholding interest, and who have a refugee status which means that applicants are not "nationals" of Cuba within the meaning of the blocking regulations, although it is not alleged that they had lost Cuban nationality or acquired other nationality prior to 1963.[20]

There is no claim that under Cuban law the Yateritas Corporation withered away when the stockholders left Cuba in 1960. Yateritas performed services, pursuant to its contract, in 1963 and 1964, and the lawsuit relates to the amounts due for those services, and also to the proceeds of the securities pledged

17. Staff Memorandum, *supra*, note 16, at p. 9. *See* S. 947.

18. U.S. Treasury Department, Office of Foreign Assets Control, Census of Blocked Cuban Assets in the United States (1964), printed in Hearings on the Foreign Assistance Act of 1965, House of Representatives, Committee on Foreign Affairs, 89th Cong., 1st Sess., 1264, 1266 (1965).

19. As originally passed the Bill provided for the vesting and sale of assets owned by the Cuban government. This provision was repealed the following year, P.L. 89–262, 79 Stat. 988 (Oct. 19, 1965). The accompanying report of the Senate Committee on Foreign Relations indicates that the Committee had been persuaded by the following argument advanced by the Department of State:

    * * * it is the Department's view that the vesting and sale of Cuban property could set an unfortunate example for countries less dedicated than the United States to the preservation of property rights. The Government of the United States, as a matter of policy, encourages the investment of American capital overseas and endeavors to protect such investments against nationalization, expropriations,

intervention, and taking. To vest and sell Cuban assets could, therefore, be counterproductive. It would place the Government of the United States in the position of doing what Castro has done. It could cause other governments to question the sincerity of the U.S. Government in insisting upon respect for property rights. The result could be a reduction, in an immeasurable but real degree, of one of the protections enjoyed by American-owned property around the world. Should this protection be diminished, the task of economic development to which the United States is devoting a great part of its strength and resources could become more difficult because of an attendant decrease in such investment.

20. For the text of blocking regulation § 515.302 which defines national, *see* note 5, *supra*.

    As to nationality of the applicants, the record discloses only that Enriqueta Schueg Bosch became a naturalized citizen of Brazil in 1966, subsequent to the 1963 blocking action.

    As to residence, the record does not disclose residence of the stockholders in 1963. As to residence of appellants at the time of institution of these actions in 1967, see note 1, *supra*.

as a guarantee of contract performance. The 1965 settlement agreement with the United States Navy was signed by the corporation, by officers asserting the right to act in its name.

In our view disregard of the corporate entity and national character of the Cuban corporation owning the assets is not required either by the Constitution or by the unblocking statute, even taking into account the possibility of construing such statute in accordance with elemental fairness or international usage.

■ In barest cenceptual terms it has long been accepted as at least the general rule that the rights of those investing in a venture organized in corporate form are defined by the law of the place of incorporation, and that stockholders in a corporation organized under the laws of a foreign country submit, to that extent, to their governance by the law of a foreign country. *See* Restatement of Conflict of Laws II, §§ 296–310 (P.O.D. April 22, 1969).

These are not arid conceptions. A world where hopefully there will be increasing cooperation between citizens of different states has more, not less, need of doctrines for determining the ground rules governing their relationships. The choice of law of the place of incorporation has merit in terms of reasonableness and maximizing common ground of international understanding.

A nation may have scope to effectuate its policies concerning assets within its jurisdiction without being bound by technical considerations of corporate entity and corporate domicile. But certainly it is at least presumptively acting reasonably, and without being subject to the charge of abitrary or tyrannical action, if it assumes that assets owned by a Cuban corporation are indeed assets in which there is a Cuban national interest.

The reasonableness of this approach is heightened by the possibility, perhaps the likelihood, that the foreign country will assert an interest in the assets of corporations organized under its laws. An important, if not the dominant, star for guiding national actions and reactions is the desire to build future areas of settlement and good will between nations to replace present areas of tension. It is not unreasonable for the American authorities to treat the property of a Cuban corporation as a matter of Cuban interest and concern, when this and future Cuban governments are likely, with some support in fundamental legal principles, to assert such an interest.

Applicants rely on Kaufman v. Societe Internationale, 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853 (1952) as mandating a requirement of piercing the corporate veil in matters relating to government seizure of assets. But in that case the Government seized the property of "a neutral corporation organized in Switzerland." (343 U.S. at 158, 72 S.Ct. at 612) Congress permitted this to be done when the ownership and control of what was in form a neutral corporation was in substance tainted by enemy interests. The Court construed the relevant provisions of the Trading with the Enemy Act—§ 2; § 5(b) (as to the provisions concerning vesting, as distinguished from the provision relating to blocking) ; and § 9(a)—as permitting the government to pierce the corporate veil, because of the interest of enemy stockholders, but as providing that in that event the government must protect the position of the innocent stockholders. *See* 343 U.S. at 159, 72 S.Ct. 611, 96 L.Ed. 853.

Applicants also cite Taterka v. Brownell, 117 F.Supp. 506 (S.D.N.Y.1953), which extended the rule of *Kaufman* to innocent stockholders in enemy corporations. We have no occasion to consider whether or not the ruling of *Taterka* is correct. Assuming that it is, it stands at most as an interpretation of the provisions of §§ 2 and 9(a) of the Trading with the Enemy Act as applicable to assets that were not only blocked pursuant to § 5(b) of that Act, but were vested pursuant to a separate and distinct provision of § 5(b).

If the blocking of Cuban assets under § 5(b) of that Act is followed by vesting

action, the vesting need not be under § 5(b) of that Act. Different statutory authority has been provided for the vesting of blocked property of Bulgaria, Hungary and Rumania, and nationals thereof, see 22 U.S.C. § 1631a, and for the vesting of the proceeds of the blocked Czechoslovakian steel mill equipment, see 22 U.S.C. § 1642a. Those vesting actions do not have the same statutory companions as those considered in *Kaufman* and *Taterka*. And perhaps Congress will not adopt the same companion provisions when and if it passes a statute authorizing the vesting of Cuban assets.

5. Applicants protest that it is merely playing with words to suggest that their claims may be defeated because the action denying them access to the underlying property has been denominated blocking rather than vesting.

We agree with the applicants that even blocking involves a deprivation of property. We also are aware that men live in a shorter run than the government, and that what may be considered only a temporary freeze by a government may be a permanent denial to the individual whose life comes to an end while the government ponders its course.

■ Nevertheless, it is also true that it may be reasonable and hence valid for a government to take more drastic measures in time of emergency, especially when they are reasonably limited in time, than it would propose or justify as permanent legislation. *See, e. g.*, Yakus v. United States, 321 U.S. 414, 441, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481 (1934); Wilson v. New, 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755, L.R.A.1917E, 938 (1917).

These and kindred considerations would justify a blocking that did not allow for the claims of these applicants even assuming they would be, or might even have to be, taken into account in any permanent vesting legislation.

In the first place a court should not dismiss entirely the possibility of a turn of events with Cuba that may modify or even reverse the economic isolation of Cuba and the measures which limit the assets available to the Cuban government for its domestic and foreign programs, and may either obviate the need for vesting, or eventuate in an international agreement with Cuba relating to mutual recognition and settlement of claims. In our time we have seen startling changes in our relations with other countries, e. g. Yugoslavia, Indonesia, and for that matter Cuba itself.

The reasonableness of the position of the United States must take into account pertinent concepts of international law. We have considered the text and notes to § 192 of the Restatement of the Foreign Relations Law of the United States (1965). The Reporter's note points out that the United States has been historically reluctant to find that there has been a "taking" by another state when there has been no divestment of title. As already noted, it was the State Department's persuasion that led the Congress to repeal its action divesting Cuban property (and applying the proceeds realized on sale). The State Department stressed the basic position of the United States in avoiding governmental taking of property (*see* note 19).

On the other hand, the text of § 192 recognizes a "constructive taking" doctrine under which governmental action that constitutes a limitation on use extensive in impact, and indefinite in duration, may be equivalent to a "taking," whatever label is used. And the Foreign Claims Settlement Commission has held that the Hungarian and Czechoslovakian Rent Control Laws were so restrictive of ownership rights as to amount to a taking. Further, the United States-Polish Claims Settlement Agreement, July 16, 1960, T.I.A.S. 4545, specifically provides that deprivation of use is compensible.

■ The blocking of accounts is generally recognized as different from taking, though raising a problem of taking

"if continued indefinitely." The Reporter's note states:

> The temporary blocking or freezing of the accounts of aliens within the territory of a state, suspending the right of withdrawal but not affecting ownership, does not appear to have been regarded as a taking of property. If continued indefinitely, however, it might well be treated as such.

While the question is not free from difficulty, we think the sound course at the present juncture is for the courts to treat the blocking of Cuban accounts as not yet shorn of its temporary or interlocutory character, and to avoid a fixing of our government's course, not yet adopted by the legislative or executive branch, in the direction of vesting the assets of aliens.

In any event, and even assuming for sake of discussion that the blocking action's reasonableness must be determined by assuming that it is a forerunner of vesting, the court is not in a sound position to determine now that a vesting action which failed to take account of the claims of friendly aliens holding stock in Cuban corporations would be invalid. This kind of determination should be made only after Congress has undertaken to determine what it considers a reasonable course to follow in respect of vesting of assets. It may be that Congress, in its balance of interests, might undertake to pierce the corporate veil in some types of situations and not others, or to do so for only a portion of the claim, or after deduction of a percentage for administrative costs.

It may be, for example, that Congress will decide that the claim of applicants to participate in the Cuban corporation's $20,000 bond, posted in the United States for many years, and used since 1963 only to perform a contract for the Navy, stands with higher equity than the claim to participate in the $36,950 contract price, which is alloyed both by the circumstance that it represents an attempt to profit from activities in Cuba after July 1963, and by the condition that the claim is for gross proceeds without any deduction for the costs incurred in Cuba in acquiring and transporting the water to the line of the Guantanamo Base.

Other aspects of the claims of these applicants may undercut their priority in the Congressional view. Are claimants really deprived by action of the United States Government? Suppose the Navy had transmitted to Yateritas its performance bond, or moneys due for water supplied between November 1963 and February 1964 (as it paid for water supplied prior to November 1963). How could applicants have participated or benefited? Suppose Yateritas, the Cuban corporation, was subject to Cuban blocking regulations which prohibited transfer to stockholders outside Cuba. Appellants' complaint alleged that all assets and properties of the corporation (other than those involved in this case) "have been seized and apparently retained by the Castro forces." The statute provides for consideration of such matters as nationalization, expropriation, or intervention by the Foreign Claims Settlement Commission in the pre-settlement adjudication of American claims against Cuba. (22 U.S.C. § 1643b)

If the government's transfer of the property to the Cuban corporation would have relegated appellants to the assertion of nationalization claims against Cuba by the nations of their present residence, has the government's prohibition of that transfer, at least for the time being, resulted in a realistic worsening of appellants' position?

If as appears likely at least some of the stockholders failed to become nationals of other countries, in the sense of citizens, prior to the Cuban nationalization,[21] they may not even have access to a nation prepared to present their claims under usages of international law.[22]

---

21. *See* note 20.

22. Congress has provided for pre-settlement determination, "in accordance with

6. In considering the reasonableness of the government's blocking program we interject to take note of 31 CFR § 515.521, which permits remittances for necessary living expenses, not to exceed $100 per month, where the blocked account "is in the name of, or in which the beneficial interest is held by, the payee or members of his household." We do not undertake to decide whether, given the liberal purpose of this provision, the interest of a stockholder may qualify as a beneficial interest. That is not the basis of this lawsuit, and the point has not been briefed or argued. To the extent that the blocking regulation permits this kind of hardship relief, its reasonableness is obviously enhanced.

7. To recapitulate, even if our government had unilaterally vested the assets involved in this case, any claims by plaintiff resting on an assertion of illegality would encounter substantial problems, starting with the proposition that our government may well be able to accept the country of incorporation as establishing the nationality of a corporation having assets within our borders without being required to pierce the corporate veil. But we need not determine whether a vesting law could validly exclude the claimants before us, either entirely or in part, either outright or by virtue of preference or other provisions.

▮ So far there has been only a blocking program. While international affairs may move at a pace of bewildering rapidity, often negotiation is conducted with persistence and patience at snail's pace. Negotiation may be deferred while relationships are left to simmer without stirring, in order to strengthen any possible threads of international accord or reconciliation. We have no basis for saying, at least on the bare record of these pleadings, that blocking is only a name and that the only discernible outcome is unilateral vesting. Even assuming such a conclusion, however, the courts would properly give latitude to Congress in terms of time and substantive determinations, to evolve a set of vesting provisions which it deemed reasonable in the light of a broad overview of the relevant circumstances.

▮ Taken as a blocking measure, the regulations freezing transfer in this country of the assets of a Cuban corporation are not unreasonable, particularly where, as here, reasonableness must take into account prevailing concepts of international law and understanding.

8. It is in this perspective that we must determine whether the reasonableness of the blocking program and its application to Cuban corporations is undercut by the government's practice, established at the request of Congress, whereby licenses are granted to American stockholders for transfer of their proportionate interests of the blocked assets of Cuban corporations, wholly or substantially owned by American stockholders on July 8, 1963.[23]

---

applicable substantive law, including international law," of claims by individuals for losses resulting from Cuba's nationalization of property, only if the property was owned by citizens of the United States at the time of the loss. See 22 U.S.C. §§ 1643a(1), 1643b(a), 1643c(a).

23. This practice was announced in a statement issued October 7, 1965 (30 Fed.Reg. 12812). Applications by American stockholders must detail corporate debts, the current status of the corporation, the corporate assets, and proof of citizenship. The Senate Committee on Foreign Relations, in urging this action, noted:

[T]he Committee on Foreign Relations recommends that upon application the Department of the Treasury examine with particular care each case involving Cuban assets beneficially owned by American citizens to determine whether those assets should continue to be blocked. In the committee's view, if the assets are wholly or substantially owned by citizens and residents of United States they should be unblocked, since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban Government. This would be tantamount to using the

We have no occasion to pass on the wisdom or desirability of the government's practice whereby American shareholders of Cuban corporations are treated more favorably than the shareholders resident in other friendly countries, whether Brazil or, say, Holland. In terms of policy the issue is largely of international relations, and we cannot say that it is beyond the power given to the President by Congress.

We do have the function and duty of considering whether such a discrimination against friendly aliens is unconstitutional. The courts stand ready to safeguard aliens against unreasonable discriminations, and to invoke the equal protection clause of the Fourteenth Amendment as to actions by states, or the due process clause of the Fifth Amendment which provides equivalent safeguards against unreasonable action by the Federal Government.[24]

■ Court decisions have gone far to establish equal rights for aliens resident in the United States to work for a living in the common occupations of the country,[25] even when exploiting resources "owned by a State,[26] and to own land.[27] Even aliens not resident have the right to reasonable compensation for property taken by the State.[28] In effect the burden is on the government to put forward the special reasonableness of and justification for any measure discriminating against aliens.

■ However, the program before us acts on assets within American jurisdiction of a foreign corporation incapacitated, by the hostility of its government, from ordinary commercial intercourse. The application of its assets to American shareholders amounts in effect to a partial liquidation. A historic enclave of the law establishes that a state or country may marshal local assets for the benefit of local creditors before claims of creditors outside the state or nation are realized. United States v. Pink, 315 U.S. 203, 228, 62 S.Ct. 552, 86 L.Ed. 796 (1942); Disconto Gesellschaft v. Umbreit, 208 U.S. 570, 582, 28 S.Ct. 337, 52 L.Ed. 625 (1908). We think this principle precludes interposition of constitutional objections on the part of alien stockholders objecting to a preference given to American stockholders in the marshaling of American assets, at least where the preference is given in the context of a blocking program, where Congress has not yet spelled out its permanent program, even assuming for discussion that the blocking is a forerunner to vesting the permanent program has not yet been spelled out by the legislature, and where recognition of an alien's constitutional right to participate on equal terms in American assets would convert the character of the liquidation from one that is partial and temporary to one that is absolute and permanent.

Affirmed.

property of one U.S. citizen to pay the claim of another U.S. citizen. S.Rep. No. 701, 89th Cong. 1st Sess. (1965), U.S.Code Cong. and Admin.News pp. 3581, 3585; see also H.Rep. No. 706, 89th Cong., 1st Sess., p. 7.

24. See Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Eng v. Trinidad, 271 U.S. 500, 524–525, 46 S.Ct. 619, 70 L.Ed. 1059 (1926).

25. Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D (1915).

26. Takahashi v. Fish & Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948).

27. Fujii v. State, 38 Cal.2d 718, 242 P.2d 617 (1952); see Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948).

28. Russian Volunteer Fleet v. United States, supra note 24.