560 F.2d 500
 Napoleon RICHARDSON and Francisco Chaimowicz, as Executors
of the Estate of Concepcion Brodermann Stuetzel,
also known as Concepcion Brodermann,
Plaintiffs-Appellants,
v.
William E. SIMON, as Secretary of the Treasury of the United
States, and the Bank of Nova Scotia, Defendants-Appellees.
 No. 772, Docket 76-6171.
 United States Court of Appeals,
Second Circuit.
 Argued May 18, 1977.
Decided July 26, 1977.
Rehearing and Rehearing En Banc Denied Sept. 8, 1977.
 
 Samuel Gursky, New York City, for plaintiffs-appellants.
 Diane R. Eisner, Asst. U. S. Atty. (David G. Trager, U. S. Atty., E. D. N. Y., Alvin A. Schall and Constance M. Vecellio, Asst. U. S. Attys., Brooklyn, N. Y., Jonathan B. Smith, Atty., Dept. of Justice, Washington, D. C., of counsel), for appellee Simon.
 Before MOORE, SMITH and MULLIGAN, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 Napoleon Richardson and Francisco Chaimowicz, the executors of the estate of Concepcion Brodermann Stuetzel, appeal from the judgment of the United States District Court for the Eastern District of New York, Thomas C. Platt, Jr., Judge, dismissing their complaint. The executors seek an order directing the Secretary of the Treasury ("the Secretary") to issue a license releasing certain assets that were blocked on July 8, 1963, pursuant to the Trading with the Enemy Act of 1917 ("the Act"), 50 App. U.S.C. § 1 et seq., and the Cuban Assets Control Regulations ("the Regulations"), 31 C.F.R. § 515 (1976). The executors claim that the Regulations are not authorized by the Act; if the Regulations are authorized, then the executors claim that the Act, as applied, violates the fifth amendment's due process clause. We reject both claims and affirm.
 
 I.
 
 2
 Prior to July 8, 1963 Mr. and Mrs. Stuetzel, who were residents and citizens of Cuba, placed cash and stock certificates of the Standard Oil Company of New Jersey in a joint account in a New York City branch of the Bank of Nova Scotia ("the bank"). Pursuant to § 515.201 of the Regulations,[1] these assets were "blocked" on July 8, 1963. On August 24, 1965 Mr. Stuetzel died intestate in Cuba, and, under Cuban law, Mrs. Stuetzel was his sole heir. On October 13, 1969 Mrs. Stuetzel entered the United States as a permanent resident, and on November 4, 1969 she applied for a license releasing the blocked assets. On December 12, 1969 the Secretary granted her a license under which she received one-half of the blocked assets, pursuant to § 515.525(a)(1) of the Regulations.[2] Mrs. Stuetzel died in New York in October 1971, and under the terms of her will her residuary estate was devised to her niece, Elena Richardson. Mrs. Richardson is a United States citizen residing in New York. The Secretary denied the executors' application for a license unblocking the remaining assets held by the bank.[3]
 
 II.
 
 3
 We first consider whether the Regulations are consistent with the Act. United States v. Larionoff, 431 U.S. 864, 873, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). Section 515.525(b) of the Regulations says, in pertinent part, "no transfer to any person by intestate succession . . . shall be deemed to terminate the interest of the decedent in the property transferred if the decedent was a designated national." The executors invite this court to follow Real v. Simon, 510 F.2d 557, 564 (5th Cir. 1975), rehearing denied, 514 F.2d 738 (5th Cir. 1975) (per curiam) and to hold that this portion of the Regulations "is arbitrary and without basis in either the language or the purpose of the Trading with the Enemy Act." We decline the invitation.
 
 
 4
 Section 5(b)(1)(B) of the Act says, in pertinent part,
 
 
 5
 the President may . . . investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest.
 
 
 6
 Both parties agree that the Cuban government has no interest in the blocked assets that Mr. Stuetzel had an interest in the assets when they were blocked on July 8, 1963. The parties disagree on whether Mr. Stuetzel still "has any interest" in the blocked assets.
 
 
 7
 The United States declared war on Germany on April 6, 1917, and the Act was passed on October 6, 1917.
 
 
 8
 (C)ontemporaneous conditions and war legislation indicate a purpose to employ all legitimate means effectively to prosecute the war. The law should be liberally construed to give effect to the purposes it was enacted to subserve. . . . It was not necessary for Congress to ascertain the facts of or to deal with each case. . . . It was peculiarly within the province of the Commander-in-Chief to know the facts and to determine what disposition should be made of enemy properties in order effectively to carry on the war.
 
 
 9
 United States v. Chemical Foundation, 272 U.S. 1, 10, 12, 47 S.Ct. 1, 4, 71 L.Ed. 131 (1926).
 
 
 10
 Section 5(b) of the Act was amended in 1918, 1933, 1940 and 1941. The current version of § 5(b) was Title III of the First War Powers Act, 55 Stat. 839, which was enacted on December 18, 1941. Like the earlier amendments of § 5(b), it broadened the President's powers.
 
 
 11
 Even the section of the Act setting forth the conditions for the return of property, § 32(a), says, in pertinent part,
 
 
 12
 The President . . . may return any property or interest vested in or transferred to the Alien Property Custodian . . . whenever the President . . . shall determine . . . that such return is in the interest of the United States.
 
 
 13
 We think that Congress, both in 1917 and when it later amended the Act, intended to give the President broad discretion in administering the Act, and we hold that the Regulations, as applied in this case, are authorized by the Act.[4] Cf. Nielsen v. Secretary of the Treasury, 137 U.S.App.D.C. 345, 424 F.2d 833, 836-38 (1970) (blocking of United States assets of Cuban corporation is authorized by the Act).
 
 
 14
 The Court of Appeals of the Fifth Circuit was faced with a similar factual situation in Real[5] and found the Regulations inconsistent with the Act. The court relied heavily on two Congressional reports in 1965 on Public Law 89-262, 79 Stat. 988, which amended portions of Title V of the International Claims Settlement Act of 1949, 22 U.S.C. § 1621 et seq. The report of the Senate Foreign Relations Committee, S.Rep.No.701, 89th Cong., 1st Sess., reprinted (1965) in U.S.Code Cong. & Admin.News, pp. 3581, 3585, expressed concern that "the Treasury Department is continuing to block as Cuban assets certain property situated in the United States nominally owed to or held in the name of certain defunct Cuban corporations which are substantially owned by U.S. citizens and residents." Rather than proposing an amendment to Title V, the Committee took the Secretary's suggestion and simply recommended that the Secretary
 
 
 15
 examine with particular care each case involving Cuban assets beneficially owned by American citizens to determine whether those assets should continue to be blocked. In the committee's view, if the assets are wholly or substantially owned by citizens and residents of the United States they should be unblocked, since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban government. This would be tantamount to using the property of one U. S. citizen to pay the claim of another U. S. citizen.
 
 
 16
 Id., at 3585. The report of the Committee on Foreign Affairs of the House of Representatives, H.R.Rep.No.706, 89th Cong., 1st Sess. 7 (1965), recommended "that a thorough examination be made by the Department of the Treasury on a case-by-case basis. . . ." There is no claim by the Secretary that he denied the executors' application on the basis of a case-by-case examination.
 
 
 17
 We think, however, that these two Congressional reports give little support to the executors' argument. First, using the opinion of Congress in 1965 to discern Congressional intent in 1941 is very risky. Securities & Exchange Comm'n v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 199-200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); United States v. Mauro, 544 F.2d 588, 594 (2d Cir. 1976). Second, the 1965 Congressional concern involved corporate assets, not the estates of individuals. Finally, these two Congressional reports indicate that in 1965 Congress thought that the Act authorized the Secretary to proceed either on a case-by-case basis or on the basis of the Regulations. It may have been unwise for Congress not to have amended the Act in 1965, but it is not for this court to act when Congress chose not to.
 
 
 18
 Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.
 
 
 19
 Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976).
 
 III.
 
 20
 We turn now to the executors' challenge to the Secretary's policy of permitting Mrs. Richardson to inherit any property owned, under Cuban law, by Mrs. Stuetzel prior to July 8, 1963 and preventing Mrs. Richardson from inheriting property owned, under Cuban law, by Mrs. Stuetzel after August 24, 1965. The executors claim that this classification violates the fifth amendment's due process clause.[6]
 
 
 21
 "(E)qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." (footnotes omitted). Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam); Person v. Association of the Bar, 554 F.2d 534 (2d Cir. 1977). The executors make no claim that this classification involves either a fundamental right or a suspect class. The Act is constitutional when the statutory classification, as implemented by the Regulations, is "the product of a deliberate and rational choice" by Congress. Alexander v. Fioto, 430 U.S. 634, 640, 97 S.Ct. 1345, 1348, 51 L.Ed.2d 694 (1977).
 
 
 22
 In Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 111-113 (2d Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966), we identified two major purposes of the Act as applied to Cuba: (1) to prevent the Cuban government from acquiring dollars and (2) to provide a pool of assets from which United States citizens could be compensated for wrongs done to them by the Cuban government. In Real the Court of Appeals for the Fifth Circuit identified a third major purpose of the Act: to use the blocked funds for negotiation with the Cuban government. 510 F.2d 563. The government does not explain, and we have difficulty in understanding, how releasing 50 percent of the blocked assets promotes any of these three purposes of the Act.
 
 
 23
 In analyzing whether the Act violates the due process clause, we are not, however, limited to those purposes of the Act which Congress may have articulated. Flemming v. Nestor, 363 U.S. 603, 612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). When they were blocked, the husband's funds were funds of a Cuban national, subject to possible use in some satisfaction of American claims against the country involved, either by unilateral application by the United States or as a counter in negotiations with that country. It was open to the Executive to preserve the funds in that status for such use. There may be policy arguments against trading off such funds which in the meantime have become subject to claims of ownership by American citizens against claims of other American citizens, but such matters of policy are in the first instance for the Executive and Legislative branches. Moreover, Congress could reasonably believe that a Cuban living in Cuba, under pressures from the Cuban government, might use his power to affect the disposition of blocked assets on the Cuban's death to a U.S. citizen or resident to affect the U.S. citizen's stand on certain policies towards Cuba.[7] To frustrate such possible attempts by the Cuban government, the Secretary could issue regulations which declare that a Cuban's interest in blocked assets continues after his death. Congress could also reasonably believe that when a Cuban has left Cuba and become a permanent resident of the United States, as did Mrs. Stuetzel, then the Cuban is no longer as susceptible to pressures from the Cuban government as one remaining in Cuba. With these purposes in mind, we think the Act's classification has a "reasonable basis." Mathews v. Castro, 429 U.S. 181, 182, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976). We therefore hold that the Act does not, as applied in this case, violate the fifth amendment's due process clause. Cf. Nielsen v. Secretary of the Treasury, supra, 424 F.2d at 845-46 (no violation of fifth amendment to block U.S. assets of a Cuban corporation); Sardino v. Federal Reserve Bank of New York, supra, 361 F.2d 111-113 (no violation of fifth amendment to block funds in New York bank of a Cuban residing in Cuba).
 
 
 24
 While there are strong human arguments in favor of the result achieved in Real, we think that the final disposition of the interests held by Mr. Stuetzel at the time of his death in Cuba must await determination by Congress and the Executive of the interests of the United States in its relations with Cuba.
 
 
 25
 Affirmed.
 
 MOORE, Circuit Judge (dissenting):
 
 26
 We face a rather unique factual situation. As of July 7, 1963 Carl and Concepcion Stuetzel, as man and wife, were joint owners of their property located in the Bank of Nova Scotia in New York. The next day, July 8th, their property was frozen pursuant to the Trading with the Enemy Act. Thereafter, both were powerless to exercise dominion and control over it. When Carl died intestate on August 24, 1965, Concepcion as the only heir-at-law became entitled to all of the property in the New York bank, but only in theory because the property was frozen as to both.
 
 
 27
 Concepcion entered the United States as a permanent resident on October 13, 1969. On the basis of this new status and her application for a license unblocking the property in the New York bank, the Secretary of the Treasury released 50% of the funds. Concepcion having died on October 31, 1971, her executors, all United States citizens, now seek her other half. Her niece, Elena Richardson, also a United States citizen, is the beneficiary under her will.
 
 
 28
 It is clear that under estate law, as Carl's sole survivor, Concepcion was entitled to his assets on the date of his death. It is equally clear that the assets were solidly frozen on that date. The key question, in my opinion, is: were Carl's interest in the property and his status as a Cuban national altered by reason of his death? In other words, on August 24, 1965, did Concepcion become the sole owner of the New York-located funds, and did her change of status subsequent thereto act as such a thaw as to entitle her to a release of 100% of the funds?
 
 
 29
 31 C.F.R. § 515.525(a)(2) (1976) specifically allows:
 
 
 30
 "Any transfer to any person by intestate succession;"
 
 
 31
 However, in the same section is a proviso that "no transfer to any person by intestate succession . . . shall be deemed to terminate the interest of the decedent in the property transferred if the decedent was a designated national (as Carl was)." 31 C.F.R. § 515.525(b) (1976). In other words, despite estate laws of succession to the contrary, Carl remained after death the owner of his half although not in a position to claim it.
 
 
 32
 An identical situation recently was presented to the court in the Fifth Circuit. Real v. Simon, 510 F.2d 557 (1975). The court, in reversing the denial of a license to a former Cuban national residing in the United States, was influenced in part at least by a House Report indicating that "there is no intent on the part of Congress to require the Treasury to continue blocking funds lawfully claimed by American citizens where there is no Cuban interest in the assets." Id. at 564. Assuming this as Congressional policy, the Real court said:
 
 
 33
 "With this perspective on the policies behind the blocking of Cuban assets, we return to the issue whether there is a sufficient interest on the part of the Cuban government or a Cuban national which would justify or authorize the application of the Trading with the Enemy Act and the Cuban Assets Control Regulations to the facts of this case. The Government claims there is such an interest, because the deceased, Urbano Real, retains an interest in his estate. But the real issue is whether the Government can validly, within the scope of the Trading with the Enemy Act, determine that a deceased person retains an interest in his estate. We hold that such a determination by the United States is arbitrary and without basis in either the language or the purpose of the Trading with the Enemy Act.""The Government recognizes that a Cuban interest must pertain to the assets in order to justify blocking, and so by administrative fiat has decreed that deceased persons have an interest in their assets, thus justifying the blocking of their estates. The concept that a dead person is a 'foreign national' in possession of property within the meaning of the Trading with the Enemy Act does not have the support of logic. Under the facts presented by this case, such a determination does not have the support of the congressional policies behind the Act. We conclude, therefore, that, under the facts and circumstances, the Government's determination that the deceased, Urbano Real, retains an interest in his estate which justifies withholding the assets from American citizens and residents has no basis in law and must be set aside and annulled." 510 F.2d at 564-565.
 
 
 34
 The majority rejects the Real decision but I find it most persuasive. Real rejects the stilted argument that an agency's regulations are sacrosanct, and that Carl, though in his grave, hovers as a Cuban national spirit over the vaults of the Bank of Nova Scotia. The Treasury thus, in effect, by agency fiat, has rewritten the laws of succession to read that no American citizen or anyone similarly situated is entitled to receive any inheritance from the estate of a Cuban national. This, I would hold, is beyond the power of the agency and a deprivation of property without due process. The district court, by a hypothesis not applicable to this case, assumed a sale by a Cuban national (by Carl) to someone in America, who would then seek a license, thus frustrating the freeze. But this is not such a situation. During his lifetime, Carl had property which was encumbered by the freeze order, but upon his death the property was no longer his. Death and the applicable estate laws were the agents transferring it to Concepcion. To say that these funds remain Carl's and may be retained (or in actuality confiscated) by the Government for the purpose of paying other American claimants is to hold that Concepcion and Mrs. Richardson must be deprived of their property to aid others. Whatever Carl might have tried to do with his property during his lifetime is irrelevant. We are not dealing with a situation in which the funds might trickle back to the Cuban government. The result of the majority opinion is merely to deprive an American citizen of property rightfully hers by recognized laws of descent. For these reasons I would reverse and remand.
 
 
 
 [1]
 Section 515.201 of the Regulations says:
 (a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of a foreign country designated under this part, or any national thereof, or such transactions involve property in which a foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
 (1) All transfers or credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States:
 (2) All transactions in foreign exchange by any person within the United States; and
 (3) The exportation or withdrawal from the United States of gold or silver coin or bullion, currency or securities, or the earmarking of any such property, by any person within the United States.
 (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, ruling, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
 (1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and
 (2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.
 (c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraphs (a) or (b) of this section is hereby prohibited.
 (d) For the purposes of this part, the term "foreign country designated under this part" and the term "designated foreign country" mean Cuba and the term "effective date" and the term "effective date of this section" mean with respect to Cuba, or any national thereof, 12:01 a. m., e. s. t., July 8, 1963.
 
 
 [2]
 Section 515.525(a)(1) says:
 The following are hereby authorized:
 (1) Any transfer of any dower, curtesy, community property, or other interest of any nature whatsoever, provided that such transfer arises solely as a consequence of the existence or change of marital status.
 
 
 [3]
 In the spring of 1976 the blocked assets at the bank consisted of $13,547.74 and 770 shares of the stock of Exxon Corporation
 
 
 [4]
 Section 41(a) of the Act, which deals with divestment of rights and interests of individuals in estates, also gives no support to the executors' claim. The report of the Senate Committee on the Judiciary, S.Rep.No.1062, 87th Cong., 1st Sess. 8-9 (1961), makes it clear that Congress was concerned with assets that had vested prior to April 17, 1953 and from which the government was still receiving income
 
 
 [5]
 Mr. Real was a Cuban national who died intestate in Cuba in 1965. Mrs. Real came to the United States in 1966. Mr. Real's daughter and two granddaughters are all naturalized citizens of the United States residing in Miami. Mrs. Real, the daughter, and two granddaughters sought a license from the Secretary to release securities held in a joint account at a brokerage firm
 
 
 [6]
 The fifth amendment's due process clause "encompasses equal protection principles." Mathews v. Castro, 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976); Weinberger v. Salfi, 422 U.S. 749, 768-770, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)
 
 
 [7]
 There is no suggestion here that Mrs. Richardson's views on Cuba are relevant or that Mr. Stuetzel held off from making a will and so died intestate in order to attempt to influence Mrs. Richardson's views. The effect of the Act may cause hardship "to our citizens and others who, as here, are not involved in any actions adverse to the nation's interest." Propper v. Clark, 337 U.S. 472, 481, 69 S.Ct. 1333, 1339, 93 L.Ed. 1480 (1949)