Jorge A. MIRANDA, Plaintiff, Appellant,

v.

SECRETARY OF the TREASURY, Defendant, Appellee.

No. 84–1828.

United States Court of Appeals, First Circuit.

Argued March 4, 1985.

Decided June 24, 1985.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and RE,* Judge.

RE, Chief Judge:

In this action, *pro se* appellant, Jorge Miranda, appeals from an order of the United States District Court for the District of Puerto Rico which granted summary judgment in favor of appellee, the Secretary of the Treasury. The district court upheld the Secretary's denial of Miranda's application for a license to "unblock" or release certain funds that were "blocked" or frozen pursuant to the Trading With the Enemy Act (TWEA), 50 U.S.C.App. § 1 *et seq.*, and the Cuban Assets Control Regulations (Regulations), 31 C.F.R. Part 515. The funds were originally deposited by Miranda's great aunt, a Cuban national, and are currently held in a New York branch of Citibank.

The question presented is whether the Secretary's denial of Miranda's license application constitutes an unconstitutional deprivation of property in violation of the due process clause of the Fifth Amendment. Since we hold that the Secretary's action was a lawful and proper exercise of executive discretion in the field of foreign affairs, and not a violation of the Fifth Amendment, we affirm.

In 1956, Miranda's great aunt, María Antonia Muñiz, a citizen and lifelong resident of Cuba, and her husband, deposited $25,000 into a savings account at a New York branch of the First National City Bank (now Citibank). The account was subsequently converted into a certificate of deposit.

On September 28, 1967, after her husband's death, Mrs. Muñiz executed an assignment of one-half interest in the certificate of deposit to each of two nephews-in-law, José Miranda Rodríguez (José) and Valentín Miranda Rodríguez (Valentín), both Cuban citizens residing in Spain.

José and Valentín were brothers, and Valentín is Miranda's father. On July 28, 1982, Valentín assigned his interest in the certificate of deposit to Miranda. On October 13, 1982, José's widow assigned her interest in the certificate of deposit to Miranda.

Miranda then applied to the Office of Foreign Assets Control (OFAC) of the Department of the Treasury, for a license to unblock the certificate of deposit. Although Miranda is an American citizen, OFAC denied his application.

Seeking to set aside the Secretary's decision, on September 10, 1983, Miranda sued in the District Court for the District of Puerto Rico. Contending that regulation 515.201(b)(1) prohibits a transfer of property subject to the jurisdiction of the United States in which a Cuban "national" has, on or after July 8, 1963, any interest whatsoever, the Secretary moved for summary judgment. The district court granted the Secretary's motion on September 18, 1984, and entered judgment in his favor. On September 25, 1984, alleging a violation of constitutionally protected rights, Miranda appealed.

On this appeal, Miranda contends that the district court erred in granting the Secretary's motion for summary judgment. Specifically, Miranda argues that, since no legislative intent is advanced by the continued blocking of the certificate of deposit, it is an unconstitutional deprivation of property in violation of his due process rights under the Fifth Amendment. The Secretary, on the other hand, contends that the certificate of deposit, which was the subject of an *inter vivos* transfer of a Cuban national's funds to a non-heir, is lawfully blocked pursuant to 31 C.F.R. Part 515. The Secretary contends that these regulations are a proper exercise of the authority granted under the TWEA, and are not violative of the due process clause of the Fifth Amendment.

The statutory authorization for the blocking of funds in which the Cuban government, or a Cuban national, has an interest is found in section 5(b) of TWEA.

* Chief Judge of the United States Court of International Trade, sitting by designation.

This section, in pertinent part, provides that:

(b)(1) ... the President may, through any agency that he may designate, and under such rules and regulations as he may prescribe ...

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, *regulate*, direct and compel, *nullify, void, prevent or prohibit, any acquisition* holding, withholding, use, *transfer*, withdrawal, transportation, importation or exportation of, or dealing in, or exercising *any right, power, or privilege with respect to*, or transactions involving, *any property in which any foreign country or a national thereof has any interest....*

50 U.S.C.App. § 5(b) (1982) (emphasis added).

Congress first passed TWEA in 1917 and, as enacted, the Act dealt only with the President's use of economic powers in times of war. TWEA was expanded in 1933 to deal with peacetime national emergencies. In 1942, the President delegated his authority under TWEA to the Secretary of the Treasury who, in turn, has delegated that authority to OFAC. *See Regan v. Wald,* —— U.S. ——, 104 S.Ct. 3026, 3030 n. 2, 82 L.Ed.2d 171 (1984).

In 1977, section 5(b) of TWEA was amended once again, to limit the President's power to act only in "times of war." During peacetime, the President's power to act is governed by the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1706. *See* Act of Dec. 28, 1977, Pub.L. No. 95–223, § 101(a), 91 Stat. 1625, 1625. In order to continue existing economic embargoes, Congress "grandfathered" existing exercises of the President's national emergency authorities. *Id.* § 101(b), 91 Stat. at 1625. Pursuant to the "grandfather" provision, the President may continue to exercise national emergency powers with regard to Cuba and certain other nations if he deems it in the national interest. *Id.* In the years since the 1977 amendment, the President has continued to deem such exercises of power to be within the national interest. *See, e.g.,* 49 Fed.Reg. 35927 (1984); 48 Fed.Reg. 40695 (1983); 47 Fed.Reg. 39797 (1982).

■ The authority delegated by Congress to the President under TWEA is extensive. "[B]oth the legislative history and cases interpreting the [Act] fully sustain the broad authority of the Executive when acting under this congressional grant of power." *Dames & Moore v. Regan,* 453 U.S. 654, 672, 101 S.Ct. 2972, 2983, 69 L.Ed.2d 918 (1981); *see Itek Corp. v. First Nat. Bank of Boston,* 704 F.2d 1, 10 (1st Cir.1983). The delegation of such broad powers to the President is consistent with the President's constitutionally vested role as the nation's authority in the field of foreign affairs. It is a basic principle of our system of government that, when acting pursuant to Congressional authorization in the field of foreign affairs, the President commands all the political authority of the United States. *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). Indeed, in *Curtiss-Wright* the Supreme Court stated that "within the international field" Congress may "accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *Id.* at 320, 57 S.Ct. at 221. Congress has recognized the President's special role in the field of foreign affairs and has often delegated considerable discretion. *See, e.g., Chicago & Southern Airlines v. Waterman S.S. Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *Hampton & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892).

■ Conversely, the role of the judiciary in foreign affairs is limited. *See, e.g.,*

*Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). Only recently the Supreme Court has reiterated that "[m]atters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.' " *Regan v. Wald, supra,* at ——, 104 S.Ct. at 3039 (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952) ).

In the early 1960's, Cuba's attempts to "destabilize governments throughout Latin America" were deemed by President Kennedy to constitute a national emergency. *See* Presidential Proclamation 3447, 27 Fed. Reg. 1085 (Feb. 6, 1962). Pursuant to section 5(b) of TWEA, a comprehensive embargo was imposed upon Cuba, and effectuated by the Cuban Assets Control Regulations, which were promulgated by OFAC in 1962 and 1963. *See generally* Re, *The Foreign Claims Settlement Commission and the Cuban Claims Program,* 1 Int'l Law. 81–95 (1966).

The basic purposes underlying the TWEA and the Regulations are: (1) to deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States; (2) to retain blocked funds for possible use to settle claims against the Cuban government, or to vest to the United States if necessary; and (3) to use blocked funds for negotiation purposes in discussions with the Cuban government. *Real v. Simon,* 510 F.2d 557, 563 (5th Cir.), *reh'g denied,* 514 F.2d 738 (5th Cir.1975). *See* Goodman, *United States Government Foreign Property Controls,* 52 Geo.L.J. 767, 793 (1964). As the Supreme Court has stated, "[t]he freezing of Cuban assets exemplifies the capacity of the political branches to assure, through a variety of techniques ... that the national interest is protected against a country which is thought to be improperly denying the rights of United States citizens." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 412, 84 S.Ct. 923, 932, 11 L.Ed.2d 804 (1964).

The Regulations achieve these objectives by prohibiting, unless licensed by the Secretary, the transfer, sale or other disposition of assets in which the Cuban government or Cuban nationals have an interest. *See* 31 C.F.R. § 515.201 (1984). Any transfer in contravention of the regulations is to be considered null and void unless licensed by the Secretary. 31 C.F.R. § 515.203. The validity of the "freezing" of assets of foreign countries and their nationals has often been recognized and approved by the courts. *See, e.g., Propper v. Clark,* 337 U.S. 472, 481–82, 69 S.Ct. 1333, 1339, 93 L.Ed. 1480 (1949); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 435–36, 84 S.Ct. 923, 943–44, 11 L.Ed.2d 804 (1964); *Tran Qui Than v. Regan,* 658 F.2d 1296, 1304 (9th Cir.1981); *Richardson v. Simon,* 560 F.2d 500, 503 (2d Cir.1977); *Nielsen v. Secretary of the Treasury,* 424 F.2d 833, 843–45 (D.C.Cir.1970); *Sardino v. Federal Res. Bank of New York,* 361 F.2d 106, 112 (2d Cir.), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).

The Regulations, in addition to permitting the blocking of assets in which the government of Cuba or any of its citizens has an interest, also empower the Secretary to block the assets of a "specially designated national" of Cuba. 31 C.F.R. § 515.305. The term "specially designated national" can include any person, living or dead, who is determined by the Secretary to be a specially designated national of Cuba. 31 C.F.R. 515.306. A decedent's interest in his or her estate is deemed to continue after death. 31 C.F.R. 515.327. Hence, although a license to unblock assets is authorized for transfers occurring by intestate succession, neither intestate transfers nor testamentary dispositions are deemed to terminate the interest of the decedent in the property transferred. 31 C.F.R. § 515.525.

In support of his due process argument, Miranda cites the Fifth Circuit's decision in *Real v. Simon,* 510 F.2d 557 (5th Cir.), *reh'g denied,* 514 F.2d 738 (5th Cir.1975) (per curiam). *But see Richardson v. Simon,* 560 F.2d 500 (2d Cir.1977) (continued

blocking of United States assets of a deceased Cuban national is authorized by TWEA despite intestate succession to United States national). In *Real*, the question presented was whether the United States assets of a Cuban citizen who died a Cuban resident would continue to be blocked under regulation 525.327. The court reasoned that, since the heirs were all either American citizens or resident aliens of the United States, section 5(b) of TWEA would be applicable only if the decedent retained an interest in his estate after his death. Therefore, the court concluded that since the decedent retained no interest in his estate, and his surviving intestate heirs were authorized to take possession of the assets, regulation 515.327 exceeded the authority granted by TWEA.

A subsequent Fifth Circuit case, *Tagle v. Regan*, 643 F.2d 1058 (5th Cir.1981), reaffirmed and extended *Real's* interpretation of TWEA. In *Tagle*, a Cuban national whose assets were blocked died intestate, leaving two heirs in the United States and one in Cuba. The two heirs in the United States sought a license to unblock their portion of the assets, but were refused by the Treasury Department. On appeal the court held that the Cuban heir's interest in his portion of the estate did not prevent the two heirs in the United States from obtaining a license to unblock their share of the assets.

Miranda argues that the court's holding in *Real* is controlling here since, in both cases, neither Cuba, nor any Cuban resident, had or has any present interest in the funds. We disagree.

In our view, since the *Real* case dealt with blocked funds which were transferred by intestate succession, that is, by operation of law, rather than by an *inter vivos* transfer, *Real* is clearly distinguishable from the present case.

■ In this case, Mrs. Muñiz' purported transfer or assignment of the assets in 1967 was prohibited, and null and void at the time it was made. The fact that the assignor is now deceased is not relevant. As the congressional delegation of authority under the TWEA makes clear, the President was well within his power under TWEA in preventing the *inter vivos* transfer of blocked assets. Moreover, the prohibition is rationally related to the objective of maintaining an economic embargo. The fact that Miranda, in normal circumstances, may have been able to enjoy the use of this property does not transform the blocking of these assets into a taking without just compensation in violation of the fifth amendment. *See Tran Qui Than v. Regan*, 658 F.2d 1296, 1304 (9th Cir.1981).

We are persuaded by the reasoning of the Ninth Circuit in *Tran Qui Than v. Regan*, 658 F.2d 1296 (9th Cir.1981), which dealt with funds blocked under the Foreign Assets Control Regulations pertaining to Vietnam, 31 C.F.R. Part 500, promulgated under section 5(b) of TWEA. In *Than* the court held, *inter alia*, that the refusal of the Secretary to unblock certain funds did not violate the due process clause of the Fifth Amendment. In support of its holding, the court stated:

> We recognize that blocking involves a deprivation of the enjoyment of a property interest. The deprivation is temporary, however, and is not equivalent to vesting. Vesting occurs when title to assets is transferred to the government; blocking does not transfer title but rather prohibits temporarily, transactions involving those assets. We also recognize that an action intended by the government to be a temporary block on any transactions involving those assets may amount to an interminable denial of property to the individual who must await the often slow and labyrinthian course of international relations. The possibility remains, however, that the President and the Congress may decide that resumption of diplomatic and economic intercourse with the South Vietnamese government would be in our national interest. Such a development of course might obviate the need to classify South Vietnam as a designated foreign country and to block transactions involving assets associated with that nation.

*Id.* at 1304. *See also* Restatement of the Foreign Relations Law of the United States § 192, Reporters' Notes, at 574 (1965).

In this case, there has been neither a vesting of the certificate of deposit in the United States government, nor any intimation of its impending use to satisfy the claims of United States citizens. We also note that the regulations allow the Secretary to license transfers retroactively. 31 C.F.R. § 515.203(c). Therefore, when the President lifts the embargo, the Secretary may validate Mrs. Muñiz' original assignment as well as the subsequent transfers, thereby vesting Miranda's right to the certificate. Furthermore, nothing would prevent the Secretary from exercising his discretion to license Miranda prior to the lifting of the embargo.

We cannot agree with Miranda's subsidiary contention that, since Mrs. Muñiz is deceased, no legislative intent is advanced by the continued blocking of the certificate of deposit. In *Richardson v. Simon*, 560 F.2d 500 (2d Cir.1977), the Second Circuit declined to adopt the exception for intestate distributees articulated by the Fifth Circuit in *Real.* In holding that a distributee in the United States had no right to an unblocking license, the court discerned the following legislative purpose:

> Congress could reasonably believe that a Cuban living in Cuba, under pressures from the Cuban government, might use his power to affect the disposition of blocked assets on the Cuban's death to a U.S. citizen or resident to affect the U.S. citizen's stand on certain policies towards Cuba. To frustrate such possible attempts by the Cuban government, the Secretary could issue regulations which declare that a Cuban's interest in blocked assets continues after his death.

*Id.* at 505 (Footnote omitted). Indeed, the concern expressed by the *Richardson* court is far more pronounced in the case of an *inter vivos* transfer. For example, it is not unreasonable to assume that, if *inter vivos* transfers were routinely permitted without individual scrutiny by the Secretary, Cuban nationals would transfer blocked assets to United States residents in anticipation of compensation or some other benefit. Such transactions would be virtually impossible for the Treasury Department to police, and could frustrate or destroy the effectiveness of the regulations. In addition, it is not beyond the realm of possibility that a Cuban national, under pressure from the Cuban government, may be forced to assign his United States assets to an "unblocked individual" in order to further some Cuban interest inimical to that of the United States. *See, e.g., Ferrera v. United States*, 424 F.Supp. 888, 890 (S.D.Fla.1976).

In examining the merits of Miranda's contention that the Secretary's action violated the due process clause of the Fifth Amendment, we are mindful that the fifth amendment's due process clause "encompasses equal protection principles." *Mathews v. De Castro*, 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 432 n. 1, 50 L.Ed.2d 389 (1976); *Richardson v. Simon*, 560 F.2d 500, 504 n. 6 (2d Cir.1977). As the Supreme Court stated in *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam), an "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Id.* at 312, 96 S.Ct. at 2566 (Footnotes omitted). The Cuban Assets Control Regulations do not interfere with the exercise of a fundamental right or impinge upon a suspect class. Thus, any classification made by the regulations need only be rationally related to a legitimate governmental objective in order to withstand equal protection scrutiny. *See Mathews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976). In our view, there is a rational basis for prohibiting *inter vivos* transfers of blocked assets. As we have indicated, routinely permitting *inter vivos* transfers to unblock frozen assets could encourage attempts to circumvent the embargo, and frustrate the purposes sought to be achieved by the regulations.

Therefore, we conclude that the regulations, as applied in this case, prohibiting the unlicensed *inter vivos* assignment by Mrs. Muñiz, were properly authorized by the TWEA. Thus, the Secretary's denial of Miranda's application to unblock the assets was a lawful exercise of executive discretion under the TWEA.

In view of the foregoing, it is the holding of the court that the Secretary's denial of Miranda's application for a license to unblock the certificate of deposit was not an unconstitutional deprivation of property in violation of his fifth amendment due process rights. The judgment of the district court is, therefore, affirmed.