**TRAN QUI THAN, Plaintiff-Appellant,**

v.

**Donald T. REGAN,\* Defendant-Appellee.**

**No. 79–4299.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1981.

Decided Oct. 13, 1981.

---

\* We substitute the name Donald T. Regan, the successor to the original defendant W. Michael Blumenthal, as the Secretary of the Treasury, pursuant to Fed.R.App.P. 43.

Mattaniah Eytan, San Francisco, Cal., argued, for plaintiff-appellant; Kirkwood, Kaplan, Russin & Vecchi, San Francisco, Cal., Leonard Schaitman, Washington, D. C., on brief.

Al J. Daniel, Jr., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before ALARCON and NORRIS, Circuit Judges, and CLAIBORNE,** District Judge.

ALARCON, Circuit Judge:

Appellant Tran Qui Than (Than) appeals from a grant of summary judgment in favor of the Secretary of the Treasury (Secretary). The judgment upheld the Secretary's decision to deny Than's application for a license to unblock certain funds in the

** Honorable Harry E. Claiborne, Chief United States District Judge for the District of Nevada, sitting by designation.

United States which had been blocked pursuant to § 5(b) of the Trading with the Enemy Act (hereinafter "TWEA"), 50 U.S.C. App. § 5(b), and the Foreign Assets Control Regulations (Regulations), 31 C.F.R. §§ 500.101 *et seq.* (1980). This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part and remand in part.

## I. *FACTS*

The facts are not in dispute. Than is a citizen of the Republic of Vietnam and a resident alien of the United States. Prior to fleeing from Vietnam on April 25, 1975, Than was a shareholder, director, and president[1] of the Dong Phuong Bank, a private corporation established in 1968 under the laws of the Republic of Vietnam.

As of April 30, 1975, the date on which South Vietnam fell to the communist forces, the Bank was owned by twenty shareholders, all of whom were nationals and residents of Vietnam. The Bank's ten directors owned more than 80 percent of the outstanding shares; Than was the principle shareholder, owning a fraction less than 13 percent of the shares outstanding.

The shareholder-directors met on April 15, 1975, to consider the consequences to the Bank which might follow the defeat of the South Vietnamese forces. At this meeting they unanimously adopted a resolution which provided that effective upon the day of the occupation of Saigon by the enemy forces, those members of the management board "who will be able to leave the country will be qualified to manage and to make use of all ... properties that the [Bank] possesses abroad." The resolution further provided that those board members who remained in Vietnam after the communist takeover would be empowered to "manage and to make use of the properties of the Dong Phuong Bank located in [Vietnam]."[2]

On May 1, 1975, the Provisional Revolutionary Government of Vietnam ("P.R.G.") issued a communique which directed that banks would be confiscated and thereafter "managed by the revolutionary administration."[3] On this date the Bank was the assignee of monies owed to certain local Vietnamese contractors under several contracts with the United States Army and Navy.[4]

After arriving in the United States, Than, on behalf of the Bank, sought payment from the United States Army on the executory contracts in the amount of $221,235. The Army did not dispute the validity or the amount of the claim. It refused to

---

1. There are conflicting statements in the record with respect to whether Than was president or general director of the Bank.

2. The Vietnamese text and an English translation of the Resolution was provided to the Secretary in Than's license application. It provides in part:

Management of the assets in foreign countries of the Dong Phuong Bank.

\* \* \* \* \* \*

1. Considered is the present state of urgency and the belief that the metropolis of Saigon may be taken over by the Communist government in the near future thus making impossible all banking operation with other banks in America, in Europe, and in Japan.
2. Accordingly, the Management Board decides that those among the Management Board members who will be able to leave the country will be qualified to manage and to make use of all the accounts of the Dong Phuong Bank in banks located out of Vietnam as well as all the properties that the Dong Phuong Bank possesses abroad.

3. At the same time, the Management Board empowers those among the Management Board members who will remain in Vietnam to manage and to make use of the properties of the Dong Phuong Bank located in the country.

The present decision will be enforced beginning the day when the Saigon metropolis will be occupied by the Communist government.

\* \* \* \* \* \*

3. The parties dispute the date on which the Bank was actually confiscated. Than maintains that confiscation occurred on April 30, 1975, upon the arrival of the communist forces into the Saigon City limits. The government maintains that the Bank continued to function until August, 1975. It is undisputed, however, that the Bank, in whatever form it presently exists, is now controlled by the P.R.G.

4. The executory contracts had been fully performed by the Vietnamese contractors by April 30, 1975, but a residual sum was still owed on those contracts by the Army and Navy.

make the payment, however, on the ground that the funds were blocked pursuant to § 5(b) of the Trading with the Enemy Act,[5] and the Foreign Assets Control Regulations,[6] which had been promulgated pursuant to the TWEA. The Army notified Than that he would have to obtain a license from the Secretary of the Treasury to unblock those funds in order to receive the contract payment.

In an attempt to acquire the Navy contract payments, Than signed a release to the original Vietnamese contractor of the Bank's claim as assignee of those payments. The Navy paid $49,965 to that contractor. The contractor paid $29,975.44 to Than, which represented the Bank's share of the proceeds. Than in turn remitted that amount to the other shareholders of the Bank who had fled Vietnam, except for his share, which amounted to $5798. The Navy made no mention of a need either for the contractor or Than to obtain any license from the Secretary in order to receive that payment.

5. Section 5(b) of the Trading with the Enemy Act, 40 Stat. 415, as amended, 50 U.S.C. App. § 5(b), provides in pertinent part:

> (b)(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> \* \* \* \* \* \*
>
> (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,
>
> \* \* \* \* \* \*

Section 5(b) was amended in 1977 to restrict the President's authority only to times of war. Act of Dec. 28, 1977, Pub.L. No. 95–223, § 101(a), 91 Stat. 1625. This restriction was made prospective, however. *Id.* at § 101(b). The President's authority under § 5(b) was delegated to the Secretary of the Treasury. 7 Fed.Reg. 1409 (1942). The Secretary redelegated that authority to the Director, Office of Foreign Assets Control. 32 Fed.Reg. 3472 (1967).

6. Section 500.201 of the Foreign Assets Control Regulations, 31 C.F.R. § 500.201 (1980), provides in pertinent part:

> (a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of any designated foreign country, or any national thereof, or such transactions involve property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

> (1) All transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States;
>
> (2) All transactions in foreign exchange by any person within the United States; and
>
> \* \* \* \* \* \*
>
> (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
>
> (1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States;
>
> \* \* \* \* \* \*
>
> (d) The term "designated foreign country" means a foreign country in the following schedule and the terms "effective date" and "effective date of this section" mean with respect to any designated foreign country, or any national thereof, 12:01 a. m. eastern standard time of the date specified in the following schedule, except as specifically noted after the country or area:
>
> \* \* \* \* \* \*
>
> 3. North Viet-Nam, i. e., Viet-Nam north of the 17th parallel of north latitude: May 5, 1964.
>
> 4. South Viet-Nam, i. e., Viet-Nam south of the 17th parallel of north latitude: April 30, 1975 at 12:00 p. m. e. d. t.
>
> \* \* \* \* \* \*

On December 22, 1976, Than applied to the Treasury Department's Office of Foreign Assets Control for a license to unblock the Army funds. The application was denied on February 22, 1977. The Secretary determined that the April 15, 1975, Resolution was ineffective to dissolve the corporation or transfer its assets to the shareholders. He concluded, therefore, that (1) the corporation was a "designated national" within the meaning of § 500.302 of the Regulations because it had an interest in the blocked assets after 12:00 p. m. E.D.T. on April 30, 1975, the date on which Vietnam was added to the schedule of designated foreign countries; and (2) as a "designated national," all transactions involving assets in the United States in which it had an interest were blocked. The Secretary also advised Than that the Navy funds which had already been paid would have to be traced and placed into blocked accounts.

Section 500.305 of the Regulations defines a "designated national" to include individuals and corporations who are "nationals" of a designated foreign country. Under § 500.302 the term "national" includes a citizen of a designated foreign country and a corporation organized under the laws of the designated country "or which on or since . . . [the] effective date was or has been controlled by . . . directly or indirectly, a [designated] foreign country and/or one or more nationals thereof . . ."

Than challenged the Secretary's decision in the instant suit filed on June 23, 1977.[7] Than claimed that the Regulations were inapplicable to his application because there was no designated national having an interest in the funds. He alternatively claimed that if there was a designated national with such an interest the Secretary abused his discretion by failing to issue a license unblocking the funds. Than further alleged that the Secretary's refusal to issue a

license was (1) contrary to the Fifth Amendment's prohibition against the taking of property without just compensation; (2) impermissibly discriminated against aliens in violation of the Fourteenth Amendment; and (3) violated his rights under the 1961 Treaty of Amity and Economic Relations between the United States and the Republic of Vietnam.[8]

The district court entertained cross-motions for summary judgment and entered judgment for the Secretary. The court upheld the Secretary's decision not to issue an unblocking license, finding that the Bank was a designated national under the Regulations and that the Secretary's determination that the Bank was not dissolved by the April 15 Resolution was not "arbitrary, capricious, an abuse of discretion, or contrary to law." The court further found no constitutionally impermissible taking nor any violation of equal protection and concluded that the Treaty relied upon by Than terminated upon the fall of the Republic of Vietnam and, thus, could not support his claim.

## II. *STANDARD OF REVIEW*

The district court reviewed the action of the Secretary, acting through the office of Foreign Assets Control, pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* Than contends that this was in error. He asserts that the Secretary's decision should have been reviewed under § 9(a) of the TWEA, 50 U.S.C.App. § 9(a). Than's assertion is incorrect.

Section 9(a) of the Act authorizes "[a]ny person not an enemy or ally of enemy[9] claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered or paid to the [United States Government] or seized by [it]" to seek return of the property through an administrative pro-

---

**7.** The district court found that Than was authorized to bring the action on behalf of himself and the other shareholders by the shareholder-directors known to have successfully fled Vietnam. The issue of Than's capacity to sue is not before us on appeal.

**8.** 12 U.S.T. 1703 (1961).

**9.** The terms "enemy" and "ally of enemy" are specifically defined in § 2 of the TWEA 50 U.S.C.App. § 2. It is conceded that Than is not an "enemy" or "ally of an enemy" as defined in that section.

ceeding or through a suit in federal district court.

Judicial review of the Secretary's denial of an unblocking license does not lie under § 9(a) because that section provides a means "through which eligible persons may seek recovery of property *seized* under the [TWEA]. *Cornet Stores v. Morton*, 632 F.2d 96, 98 (9th Cir. 1980) (emphasis added). Than cites no evidence in the record that the Army payments have been "conveyed, transferred, assigned, delivered or paid" or otherwise seized by the United States government. The blocking of the assets represented by the Army contract payment does not affect the interest, right or title to them which Than may possess. *See Nielsen v. Secretary of the Treasury*, 424 F.2d 833, 844 (D.C.Cir.1970). The blocking action merely suspends indefinitely the right to transfer those funds.

Than contends that if § 9(a) is not construed to provide the jurisdictional predicate for judicial review of the Secretary's decision, he will be left without a remedy because § 7(c) of the TWEA[10] precludes such review under the Administrative Procedure Act. This contention is without merit. Section 7(c) limits the relief or remedy of any person having any claim to property which has been conveyed, transferred, assigned, delivered or paid to the government to that provided in the TWEA. As discussed above, however, there is no evidence that the assets at issue were ever conveyed to or seized by the federal government. Section 7(c), therefore, is inapplicable to this case and does not preclude judicial review of the Secretary's decision to deny an application for an unblocking license.

■ Section 10 of the APA, 5 U.S.C. § 701(a), provides that "each authority of the Government of the United States" is subject to judicial review "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." This section creates a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate. *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–1511, 18 L.Ed.2d 681 (1967); *State of Washington v. Environmental Protection Agency*, 573 F.2d 583, 587–88 (9th Cir. 1978).

Judicial review of the Secretary's decision to deny Than's application for an unblocking license is not precluded by either exception of section 701(a). We find nothing in the legislative history of the TWEA which prohibits such review either expressly or by implication. There simply has been no "showing of 'clear and convincing evidence' of a ... legislative intent ... [to] restrict access to judicial review." *Abbott Laboratories v. Gardner, supra*, 387 U.S. at 141, 87 S.Ct. at 1511. We conclude, therefore, that the district court was correct in reviewing the Secretary's decision under the Administrative Procedure Act.[11]

---

**10.** Section 7(c) of the TWEA, 50 U.S.C.App. section 7(c) provides in pertinent part:

The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the [Government] or required so to be, or seized by [it] shall be that provided by the terms of this Act ...

**11.** Appellant's contention that the district court was incorrect in reviewing the Secretary's decision under § 706 of the Administrative Procedure Act, 5 U.S.C. § 706 is erroneous. That section provides in pertinent part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

### III. DESIGNATED NATIONAL

██ In the February 22, 1977, letter denying Than's application for an unblocking license, the Secretary stated:

The Dong Phuong Bank, a Vietnamese corporation, is a designated national under the Regulations. The Regulations prohibit, in the absence of a Treasury license, all transactions involving assets in the United States in which a Vietnamese national has, or has had on or since April 30, 1975, any interest whatsoever. On April 30, 1975, the Bank had an interest in the funds due under all contracts which had been assigned to it. This interest could not be transferred after April 30, 1975, without a license from this Office.

The actions of the shareholders and directors of the Bank described in the Application were ineffective to dissolve it or transfer its assets. The Resolution signed by the directors of the bank ten days prior to the fall of Viet-Nam stated that its intent was to allocate management and control of the United States assets of the Bank to the shareholders who left Saigon prior to its fall. The Resolution did not even purport to transfer the bank's interest in the United States assets to those shareholders. Further, no evidence has been submitted in support of the assertion that the Resolution effected a valid dissolution of the corporation under the laws of South Vietnam. Accordingly, there was neither a dissolution nor a transfer made prior to April 30, 1975, of the Bank's interest in the funds to the shareholders who left Vietnam.

Than contends that the Secretary abused his discretion in refusing to grant him a license for several reasons. First, he maintains that there is no designated national with an interest in the assets at issue because the Bank ceased to exist prior to the effective date and was not, therefore, a corporation with an interest in the funds which would be subject to the blocking provisions of the Regulations. He argues that the April 15, 1975, shareholder-director Resolution dissolved the corporation prior to April 30 and transferred its United States based assets to those shareholders who fled Vietnam. Than argues that the Secretary erred in failing to give effect to this Resolution. We cannot say that the Secretary's interpretation of the Resolution based on the facts before him [12] was arbitrary, capricious, an abuse of discretion, or contrary to law. The meaning of the Resolution is at best ambiguous and the document does not, by its terms, conclusively establish an intent to dissolve the corporation. It merely provides that the shareholders managing to flee Vietnam should have the authority to "manage and make use of" the Bank's overseas assets. No mention is made of any authorization for those shareholders to own those assets outright. Because a rational nexus existed between the facts presented in the application before the Secretary and his determination that the Resolution did

---

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

\* \* \* \* \* \*

12. Than contends that the Secretary should have considered the Resolution in light of the chaotic circumstances under which it was adopted. None of the information with respect to those circumstances nor the purported meaning and intent of the Resolution was furnished to the Secretary, however. We may not, therefore, consider those assertions when analyzing whether the Secretary's denial of the license application was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Because we are limited to a review of the administrative record that was before the Secretary at the time of his decision, we may not consider some new record that was made in the district court subsequent to the Secretary's decision. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

Moreover, even if the document by its terms clearly manifested an intent to dissolve the Bank or Than adduced evidence in his application to support that claim, the Resolution would have been ineffective to dissolve the Bank. By Than's own admission, corporate dissolutions were forbidden in the waning days of the South Vietnamese government. In general, affect must be given to the law of the situs wherein the Bank was incorporated and operated. *Nielson v. Secretary of the Treasury,* 424 F.2d 833, 842 (D.C.Cir.1970).

not effect a dissolution, we may not set aside that determination. *See Certified Color Manufacturers Association v. Mathews,* 543 F.2d 284, 294 (D.C.Cir.1976).

■ Than contended alternatively that even if the Resolution was ineffective to dissolve the Bank, the Bank was seized and destroyed upon the fall of Saigon shortly before the Regulations became effective as to South Vietnam. This issue, however, was not before the Secretary,[13] and it was not a basis for his decision to deny the license. Than may not, therefore, raise the issue for the first time before the district court or upon appeal.[14]

## IV. *OTHER CLAIMS*

■ Than asserts that even if the Bank technically was a designated national, the Secretary abused his discretion in not piercing the Bank's corporate veil and ascribing its interest in the Army contract payments to the Bank's shareholders.[15] In our view, however, the Secretary's decision to treat the Bank as a corporate entity with an interest in the assets at issue is based upon the reasonable premise that the Vietnamese government has an interest in Vietnamese corporations. *See Nielson v. Secretary of the Treasury, supra,* 424 F.2d at 842. The reasonableness of this assumption is underscored by the possibility that the P.R.G.

may declare itself to be the successor of the Bank via expropriation and may, at any time, seek to assert such an interest.

Than asserts that the P.R.G. has no interest in the Bank's American-based assets by virtue of its alleged expropriation of the Bank. He argues that any claim to an interest in those funds by the P.R.G. derives from a confiscatory taking of the Bank in South Vietnam which would not be given legal effect by our courts because of the territorial limitation on the act of state doctrine. Since the P.R.G. could not have acquired a recognized interest in the funds, Than argues, no legal basis exists for blocking these assets. This argument is incorrect.

The judicially created act of state doctrine provides that the courts of this country "will not examine the validity of a taking of property within its own territory by a foreign sovereign government ... even if the complaint alleges that the taking violates customary international law." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). The territorial limitation on the doctrine provides that this forebearance does not extend to property *in the United States* which a foreign government attempts to take without compensation. "[O]ur courts will not give 'extra-territorial

13. Although Than raised the issue of confiscation in his application, he did not contend that the Bank was confiscated *prior to* the effective date. Moreover, he did not proffer any evidence of the date on which the confiscation allegedly occurred. The only reference to such a date is an ambiguous statement is the application: *"On or before September 1, 1975,* the Communist Government of Vietnam nationalized all privately-held banks in Vietnam. Since then, the Dong Phuong Bank has not operated in Vietnam as a private bank at all ..." (emphasis added).

14. Although the district court noted that no evidence of a "pre-effective date" seizure was presented to the Secretary, the court addressed and disposed of that issue. It was erroneous for the court to have done so. That issue was not present in the administrative record nor considered by the Secretary. The court is limited in its review of agency action to the administrative record already in existence. It is not permitted to review some new record made

initially in the reviewing court. *See Camp v. Pitts, supra,* 411 U.S. at 142, 93 S.Ct. at 1244. The court's action does not constitute reversible error, however, because the court also upheld the Secretary on the basis of the Secretary's decision that the Bank was a designated national within the meaning of the Regulations.

15. Than relies on *Kaufman v. Societe Internationale,* 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853 (1952), for the proposition that the Secretary should pierce the Bank's corporate veil and give effect to Than's claim. Such reliance is misdirected. *Kaufman* involved a challenge to the vesting of assets under § 9(a) of the TWEA. Furthermore, that decision was based on an interpretation of a particular federal statute regarding the distribution of German and Japanese assets vested after the war. As noted earlier, however, the instant case does not involve the vesting of the Bank's assets under § 9(a).

effect' to a confiscatory decree of a foreign state, even where directed against its own nationals." *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021, 1025 (5th Cir.), *cert. denied*, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972), *quoting F. Palicio y Compania v. Brush*, 256 F.Supp. 481, 488 (S.D.N.Y.1966); *see Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 687, 96 S.Ct. 1854, 1857, 48 L.Ed.2d 301 (1976).

The decision of the Secretary did not propose to nor in fact give an extra-territorial effect to any alleged expropriation by the P.R.G. of the Bank's assets in the United States. Neither the decision of the Secretary nor the judgment of the district court purported to determine title to the assets at issue. Rather, the Secretary's decision simply continues in effect the temporary blocking of the transfer of those assets until a resolution of American claims is made or some other political agreement is reached with the P.R.G.

■ Than's arguments that the blocking of the Bank's United States assets constitutes an unconstitutional taking without just compensation and violates his right to equal protection of the laws are unpersuasive. The Trading with the Enemy Act and the Regulations promulgated pursuant thereto with respect to "blocking" received the constitutional imprimatur of the Supreme Court in *Propper v. Clark*, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949). In *Propper* the Court upheld the President's "freezing" order issued pursuant to § 5(b) of the TWEA which prohibited certain transactions involving Austrian property except as they were specifically licensed by the Secretary of the Treasury. In upholding the TWEA and the Executive Order, the Court stated:

> The power in peace and in war must be given generous scope to accomplish its purpose. Through the Trading with the Enemy Act, in its various forms, the nation sought to deprive enemies, actual or potential, of the opportunity to secure

advantages to themselves or to perpetrate wrongs against the United States or its citizens through the use of assets that happened to be in this country. To do so has necessitated some inconvenience to our citizens and others who, as here, are not involved in any actions adverse to the nation's interest. That fact, however, cannot lead us to narrow the broad coverage of the Executive Order.

*Id.* at 481–82, 69 S.Ct. at 1339.

We recognize that blocking involves a deprivation of the enjoyment of a property interest. That deprivation is temporary, however, and is not equivalent to vesting. Vesting occurs when title to assets is transferred to the government; blocking does not transfer title but rather prohibits temporarily, transactions involving those assets. We also recognize that an action intended by the government to be a temporary block on any transactions involving those assets may amount to an interminable denial of property to the individual who must await the often slow and labyrinthian course of international relations. The possibility remains, however, that the President and the Congress may decide that resumption of diplomatic and economic intercourse with the South Vietnamese government would be in our national interest. Such a development of course might obviate the need to classify South Vietnam as a designated foreign country and to block transactions involving assets associated with that nation. *See Nielsen v. Secretary of the Treasury, supra*, 424 F.2d at 843–845.

We conclude that the blocking program with respect to the assets at issue does not constitute a constitutionally cognizable taking without just compensation.

■ We also find unpersuasive Than's contention that the Secretary's refusal to issue an unblocking license denies him equal protection as guaranteed by the Fifth Amendment.[16] Than speculates that the rationale for denying his application was that some of the other shareholders of the

---

**16.** The Fifth Amendment's due process clause "encompasses equal protection principles." *Mathews v. DeCastro*, 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 432, 50 L.Ed.2d 389 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 768–770, 95 S.Ct. 2457, 2468–2469, 45 L.Ed.2d 522 (1975).

Bank resided outside of the United States. He also contends that he was denied his right to equal protection because the Secretary has a policy of granting licenses to Vietnamese sole proprietors and members of partnerships resident outside Vietnam but not to Vietnamese shareholders of defunct corporations resident outside Vietnam. Both contentions are without merit.

With respect to Than's first contention, the Secretary did not deny an unblocking license on the basis of the residence of any of the other shareholders outside of Vietnam. The license was denied because the Secretary determined that the Dong Phuong Bank is a designated national within the meaning of the Regulations and because he determined that the corporation had not been dissolved prior to the effective date of blocking.

■ Nor do we find a violation of equal protection with respect to Than's second contention. Even assuming *arguendo* that the Secretary distinguishes between the applications of sole proprietors and partnerships and those of corporate shareholders, we do not find a violation of Than's constitutional rights. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." (Footnotes omitted). *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam).

The alleged classification between a sole proprietorship or partnership and a corporation does not impact upon a fundamental right or a suspect class. It is not, therefore, subject to strict judicial scrutiny. Traditional equal protection analysis provides, however, that a legislative classification which admittedly does not concern a fundamental right or a suspect class may be unconstitutional if the classification is not rationally related to a legitimate governmental interest. *See United States Department of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973); *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

The governmental interests which arguably justify the blocking provisions of the TWEA and the Regulations are threefold: (1) to prevent designated countries from acquiring dollars; (2) to provide a fund from which United States citizens could be compensated for injury occasioned them by designated countries; (3) and to use the blocked funds as a negotiating tool with the designated country.[17] Any classification by the Secretary which discriminates against Than as a corporate shareholder, therefore, must be related to at least one of the above three enumerated interests.

It is not unreasonable to assume that assets owned by an entity incorporated under the laws of South Vietnam are assets in which the P.R.G., as the successor government, has an interest. *See Nielsen v. Secretary of the Treasury, supra*, 424 F.2d at 842. Nor is it unreasonable to acknowledge the possibility that a foreign country would assert an interest in the assets of corporations organized under its laws. There is no comparable legal basis, however, for the P.R.G. to assert an interest in the United States based assets of a sole proprietorship or partnership owned by an American resident alien who had once been a South Vietnamese citizen.

Because the P.R.G. is in a position to assert an interest in the Bank's assets held in this country, it is conceivable that the United States could use the blocked funds as a diplomatic negotiating tool.[18] Such use

---

17. These purposes were articulated in S. Sommerfield, *Treasury Regulations Affecting Trade with the Sino-Soviet Bloc and Cuba*, 79 Bus. Law, 861, 862 (1964). *See also Richardson v. Simon*, 560 F.2d 500, 505 (2d Cir. 1977); *Real v. Simon*, 510 F.2d 557, 564 (5th Cir. 1975). Although *Richardson* and *Real* articulated the

purposes behind the Cuban Assets Control Regulations, the government admits in its brief that the purposes behind those Regulations and the Foreign Assets Control Regulations are virtually identical.

18. It is not insignificant that blocked assets were used as an instrument in the successful

would serve a legitimate governmental interest. We conclude, therefore, that the Secretary's differing classification between sole proprietorships or partnerships and corporations is rationally related to a legitimate governmental interest. Accordingly, we find no violation of Than's constitutional right to equal protection.

## V. *THE NAVY PAYMENT*

██ Than also sought declaratory relief that $29,975.44 which he received indirectly from the Navy through a Vietnamese contractor should not be placed into a blocked account. As noted above, in denying Than's application for an unblocking license, the Secretary stated that the Navy payments must be traced and placed into blocked accounts. The Secretary did not file a counterclaim to Than's suit seeking relief with respect to the Navy funds and Than has not applied for a license with respect to those funds.

In granting the government's motion for summary judgment the district court concluded that "the actions of the Secretary in blocking the United States based assets of the Bank and declining to issue an unblocking license were within his authority." *Tran Qui Than v. Blumenthal*, 469 F.Supp. 1202, 1212 (N.D.Cal.1979). Arguably, the judgment for the government means that the Navy funds must be placed into blocked accounts. The district court decision, however, is ambiguous on this point. We therefore, remand the case to the district court for a determination of whether the Navy funds must be placed into a blocked account.

We note that on remand the district court must determine not only whether the funds should be blocked, but if so, what amount of the payment, if any, is subject to blocking. Only a portion of the Navy payment was ultimately kept by Than. There are, therefore, equitable considerations as to whether Than should be responsible for tracing any or all of those funds. Moreover, because

these funds were paid to the Vietnamese contractor by the Navy without any notification whatsoever that the funds were subject to being blocked, and because the payment was made several years ago, there may be a question of whether the government attempt to now block those funds is barred by laches.

The judgment of the district court is AFFIRMED in part and REMANDED in part for consideration consistent with this opinion.

negotiations leading to this nation's establishment of diplomatic relations with the People's Republic of China in 1979 and in the resolution of the American hostage crisis in Iran this year.